STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  Docket No. RE-02-60
                                                  TD<sub> </sub>-CUM-1/19/06


ROBERT WELCH, et al.,

            Plaintiffs,

      v.                                          ORDER

STATE OF MAINE,

            Defendant.


This case involves a dispute between Robert Welch, Janet Welch, and Sara
Montgomery (collectively, the "Welch plaintiffs") and the State of Maine as to whether
the Welch plaintiffs, who are the owners of property abutting Rangeley Lake State Park,
are entitled to an easement over State Park land in order to access their property.

Before the court are various motions for summary judgment and two additional
motions by the State – a motion to amend its answer and a motion to strike certain
assertions in the statement of material facts submitted by the Welch plaintiffs.


1.    Motion to Amend

Before discussing the State's motion to amend, there is one procedural issue to
consider in connection with that motion. When the State filed its motion to amend its
answer to add affirmative defenses, the Welch plaintiffs filed a two-page opposition on
January 27, 2005. The State then filed its reply memorandum. Three months later,
unaccompanied by any motion for leave to submit further argument on the subject, the
Welch plaintiffs filed a supplemental memorandum opposing the addition of the State's
affirmative defenses. The State has objected to this submission and rightly so.

Motion practice would become a free-for-all if parties were entitled to submit supplemental filings whenever they felt it would benefit them. If they wanted more time in which to respond to the State's motion initially, the Welch plaintiffs should have asked for that time. At a minimum, it was incumbent on the Welch plaintiffs to seek leave from the court before filing their April 29, 2005 supplemental memorandum. The court has disregarded that memorandum.

One of the new affirmative defenses which the State seeks to add is that any quasi-easement has been eliminated by the conveyance of the alleged servient estate to *bona fide* purchasers without notice of the alleged easement.[1] The second is that, as a matter of law, the relief sought by the Welch plaintiffs is constitutionally barred because it would constitute a reduction or substantial alteration in use of park land without a 2/3 vote of the legislature required by Article IX, Section 32 of the Maine Constitution.[2] The third new defense is that the quasi-easement claimed by the Welch plaintiffs has been abandoned – an issue which appears already to be in the case given the requirement that a party claiming a quasi-easement demonstrate that the owners of the allegedly dominant estate "have not discontinued their use." Bowers v. Andrews, 557 A.2d 606, 608 (Me. 1989).

The court ultimately concludes, however, that it does not need to rule on the State's motion to amend because it can resolve the case on the existing summary judgment record without considering the State's proposed additional defenses.

---

[1] Whether the addition of this defense should be allowed might depend in part on whether it raises any new issues that are not already before the court in connection with the State's laches defense.

[2] The Welch plaintiffs respond that judicial recognition of a pre-existing easement would not constitute reduction or alteration of park land.

2

2.      State's Motion to Strike

In the court's view, if parties object to assertions contained in Rule 56(h) statements on the ground that they are not based on admissible evidence, it is not necessary to file a motion to strike. There is no reason why such objections cannot be made in a party's responding Rule 56(h) statement or its memorandum of law. To the court's knowledge, the Law Court has never suggested that motions to strike are necessary to preserve objections to unsupported factual assertions.[3] Nevertheless, the court has considered the points raised in the State's motion to strike and concludes that the State's objections are unfounded.[4]


3.      Cross-Motions for Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. E.g., Johnson v. McNeil, 2002 ME 99 ¶ 8, 800 A.2d 702, 704. The facts must be considered in the light most favorable to the non-moving party. Id. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for summary judgment as a matter of law, summary judgment should be granted. Rodrigue v. Rodrigue, 1997 ME 99 ¶ 8, 694 A.2d 924, 926.

---

[3] The U.S. District Court for the District of Maine has recently promulgated a local rule banning motions to strike in connection with summary judgment motions, and Maine's Civil Rules of Advisory Committee has recently recommended a similar rule change in Maine practice. The Supreme Judicial Court has not yet acted on that recommendation.

[4] The parties agree, however, that the court should not consider any extraneous notations on Exhibits B and D to the Fowler Affidavit.

3

Before turning to the substance of the parties' cross-motions, there are two procedural issues to consider. The first is the State's motion, dated July 18, 2005 and filed July 19, 2005, to amend the summary judgment record to add two additional maps. Because this motion was filed a number of months after the cross-motions were fully submitted and because the information sought to be presented was information that was new to the Welch plaintiffs and would require that they be given the opportunity to respond, the court will deny the State's motion.

In the reply papers the State filed in connection with its motion for summary judgment, the State also filed a March 21, 2005 affidavit from the State's counsel referring to Rule 56(f). In this instance, however, the State was invoking Rule 56(f) not to oppose the Welch plaintiffs' motion but to suggest that the State could, with further submissions, bolster its case for the admissibility of certain of the documents the State had offered in support of its own cross-motion. Rule 56(f) is not a mechanism to allow a party to improve its summary judgment motion after the opponent has responded and pointed to certain alleged omissions. The court will not consider the March 21, 2005 affidavit from the State's counsel.[5]

4.    The Relevant Facts

Many of the following facts are undisputed. In the case of a factual dispute, the court accepts the version of facts proffered by the Welch plaintiffs.

---

[5] With respect to the specific documents at issue in that submission, the court would observe that out of state residence or other inability to attend a trial (in the cases of Michael Foster and F.S. Dickson III) do not prevent a party from obtaining an affidavit (for purposes of summary judgment) or taking a deposition (for use at trial in the case of a witness who is beyond the reach of a trial subpoena). However, the September 3, 1977 Foster letter would potentially be admissible under M.R.Evid. 803 (16) if authenticity could sufficiently be established under M.R.Evid. 901(b)(8) or otherwise. On the existing record, that letter has not been sufficiently authenticated by Knoll's affidavit. The January 14, 1960 Dickson letter would also be potentially admissible under Rule 803 (16), but the current summary judgment record does not contain a sufficient showing of authenticity under Rule 901(b)(8) with respect to the presence of that letter in Mead Oxford's files.

4

The locus of this dispute is a peninsula on the south shore of Rangeley Lake. On the west side of the peninsula is South Bog Cove and on the east side of the peninsula is South Cove. The entire peninsula, with the exception of the Welch plaintiffs' land, is part of Rangeley Lake State Park. The property for which the Welch plaintiffs seek an easement (hereinafter, the "Welch parcel") is located on the west side of the peninsula, fronting South Bog Cove. Except for its frontage on South Bog Cove, it is completely surrounded by Rangeley Lake State Park. A current map of the area, conceded by all parties to be correct, is annexed as Exhibit A to the Affidavit of Stephen Curtis.

Prior to 1880 the entire peninsula, together with large portions of Rangeley and most of Rangeley Plantation, were included with extensive land holdings that had been assembled by Abner Toothaker, Ebenezer Coe, and David Pingree (or the Pingree Trustees). State's SMF dated February 14, 2005 ¶ 14 (admitted).

In an exchange of deeds on October 27, 1892, the Toothaker, Coe and Pingree land holdings were severed along the Rangeley/Rangeley Plantation town line. The heirs of Toothaker became the owners of the land in Rangeley, and Coe and the Pingree Trustees became the owners of the land in Rangeley Plantation. Plaintiffs' SMF dated January 21, 2005 ¶ 5. Because the peninsula was located in Rangeley and the border between Rangeley and Rangeley Plantation ran across the bottom of the peninsula, the heirs of Toothaker became the owners of the peninsula but could only access the peninsula via Rangeley Lake or by crossing over Coe and Pingree land. Id.

There is a dispute between the parties as to whether there was any road access to the peninsula at that time. Accepting the Welch plaintiffs' version of the facts for purposes of summary judgment, there was a road shown on an 1887 Colby atlas and on an 1895 map of Franklin County which ran north from Rumford through Roxbury, Byron, and Township D to Rangeley Plantation. According to the 1887 Colby map, this

5

road branched at a place identified as the "Burnham Lot" in Rangeley Plantation and then ran northeast to the shore of Rangeley Lake, crossing into Rangeley and terminating on the eastern side of the peninsula. Plaintiffs' SMF dated January 21, 2005 ¶¶ 6-7; Sackett Affidavit Exhibit A-1.

At the time the heirs of Toothaker conveyed the land south of the Rangeley/Rangeley Plantation border to Coe and the Pingree heirs, they reserved to themselves "the right to use Rangeley Outlet Stream and its shores for the purpose of booming, diving, and holding logs" and also reserved to themselves "the right to pass and repass and camp . . . along said stream for said purposes . . . also reserving the right to haul and yard and land logs cut on Rangeley Town across any lands and upon the shores of any waters now owned by [the Toothaker heirs and Coe and Pingree Trustees]." State's SMF dated February 14, 2005 ¶ 19 (admitted).

The Welch plaintiffs do not contend that they have any easement based on the 1892 deed to Coe and the Pingree Trustees. The issue in this case is whether there is an implied easement through the land located on the peninsula north of the Rangeley/Rangeley Plantation border that was deeded to the heirs of Toothaker in 1892 and is now owned by the State.[6]

The Welch plaintiffs' land was separated from the remaining land on the peninsula as a result of two additional conveyances. In June 1893 the heirs of Toothaker conveyed most of the peninsula north of the Rangeley/Rangeley Plantation border to Rumford Falls Paper Company but excluded a thirty-rod wide strip running around the peninsula along the shore of Rangeley Lake. Plaintiffs' SMF dated July 21, 2005 ¶ 10. In July 1893 Frederick S. Dickson acquired the 30-rod wide strip of land

---

[6] The Welch plaintiffs have offered evidence that Bayroot LLC, the current owner of the land south of the Rangeley/Rangeley Plantation border, is willing to grant them an easement over that land if this court rules they are entitled to an easement over the State Park land. Plaintiffs' SMF dated July 21, 2005 ¶ 2.

along the shore of the peninsula from the heirs of Toothaker. State's SMF dated February 14, 2005 ¶ 52 (admitted); Plaintiffs' SMF dated July 21, 2005 ¶ 11 (admitted). No evidence has been offered that any easements or rights of way were conveyed with the 30-rod strip, although as noted above the Welch plaintiffs have offered evidence that there was a road at that time which ran from Rumford to the eastern end of the 30-rod strip. Sackett Affidavit, Exhibit A-1.

The 30-rod strip, which ran along the entire shore of the peninsula when conveyed to F.S. Dickson in 1893, was thereafter divided into smaller parcels. The parcel that now belongs to the Welch plaintiffs was part of a slightly larger parcel that was conveyed by F.S. Dickson to F.S. Dickson II and Elizabeth Dickson in 1902 and is located at the extreme southwestern end of the 30-rod strip. Plaintiffs' SMF dated January 21, 2005 ¶ 12 (admitted). The road shown on the 1887 Colby atlas and the 1895 map intersects the opposite (eastern) end of the 30-rod strip, and the route of that old road as shown on those maps does not intersect the parcel now owned by the Welch plaintiffs. Sackett Exhibit A-1.

There is no road access to the parcel owned by the Welch plaintiffs. Plaintiffs' SMF dated January 21, 2005 ¶ 13. After the Welch parcel had been separated from the rest of the 30-rod strip, the State thereafter acquired the remainder of the 30-rod strip. In a series of transactions beginning in 1959 the State also acquired the remaining land on the peninsula below the 30-rod strip and north of the Rangeley/Rangeley Plantation border, as well as additional land below the Rangeley Plantation border. All this State land has been incorporated into Rangeley Lake State Park. Plaintiffs' SMF dated January 21, 2005 ¶ 12 (admitted); State's SMF dated February 14, 2005 ¶ 6 (admitted).

The State has constructed a road into the State Park but that road runs along the eastern side of the peninsula and does not provide access to the Welch parcel. State's

7

SMF dated February 14, 2005 ¶ 7; Curtis Exhibit A. In addition, the road into the park is gated during the off-season and is not plowed in winter. State's SMF dated February 14, 2005 ¶¶ 7-8 (admitted). As a result, the Welch plaintiffs' property is landlocked on three sides by Rangeley Lake State Park and can be accessed only from the west via Rangeley Lake.

The Welch plaintiffs' complaint seeks a determination that the Welch plaintiffs have an implied easement across Rangeley Lake State Park under two theories. The first is an easement by necessity (Count 1); the second is a quasi-easement (Count 2). They argue that those doctrines are available whenever a larger parcel which has road access is divided so that one of the parcels is severed from the parcel with access.

The State, in response, argues that the Welch plaintiffs' claim is barred by laches. The court does not need to rule on the State's laches defense, however, because it concludes the State is entitled to summary judgment on the merits of both of the Welch plaintiffs' theories. In the following discussion, the Welch plaintiffs' two theories will be considered in reverse order.

4.    Quasi-Easement

A quasi-easement may be created when a common grantor severs real estate, conveying part and retaining the balance (or conveying the balance to a third person), and the circumstances denote the grantor's intent to subject the retained land to an easement for the benefit of the conveyed land. Frederick v. Consolidated Waste Services, Inc., 573 A.2d 387, 389 (Me. 1990). In order for such an easement to be recognized, three conditions must be met:

> (1) the property when in single ownership [must have been]
> openly used in a manner constituting a "quasi-easement"
> (defined as existing conditions on the retained land that are

8

> apparent and observable and the retention of which would clearly benefit the land conveyed); (2) the common grantor who severed unity of title must have manifested an intent that the quasi-easement should continue as a true easement, to burden the retained land and benefit the conveyed land; and (3) the owners of the conveyed land must have continued to use what had been a quasi-easement as a true easement.

Id., 573 A.2d at 389-90 (citations and internal quotations omitted).

Assuming, without deciding, that the existing summary judgment record would permit inferences that the first two of the above conditions could be met, the undisputed record contains no evidence that the owners of the conveyed land (the Welch plaintiffs and their predecessors in title) have continued to use any quasi-easement that may have existed as a true easement. Plaintiffs acknowledge that there is now no road access to the property. Plaintiffs' SMF dated January 21, 2005 ¶ 13. They also have offered no evidence that they or their predecessors in title ever accessed their parcel from the road shown on the 1887 Colby Atlas or from any other road that currently exists or formerly existed on the State land now incorporated into Rangeley Lake State Park.

On a motion for summary judgment, a party who has the burden of proof must present enough evidence to establish that there are disputed issues of fact on each element of the claim. E.g., Reliance National Indemnity v. Knowles Industrial Services Corp., 2005 ME 29 ¶ 9, 868 A.2d 220, 225. Because the Welch plaintiffs have offered no evidence that the owners of the Welch parcel continued to use any easement that may have existed, the State is entitled to summary judgment on the Welch plaintiffs' quasi-easement claim.

9

5.    Easement by Necessity

The Welch plaintiffs also contend that they are entitled to an easement by necessity over State Park land. An easement by necessity arises when a grantor conveys a lot from a larger parcel and that conveyed lot is landlocked by the grantor's surrounding land and cannot be accessed by a road or highway. Frederick v. Consolidated Waste Services, Inc., 573 A.2d at 389. The creation of an easement by necessity depends on three elements: "(1) the conveyance of a lot out of a larger, divided parcel; (2) a lack for all practical purposes of access to the conveyed lot; and (3) the availability of relief in the form of an easement across the retained land of the conveyor." Murch v. Nash, 2004 ME 139 ¶ 18, 81 A.2d 645, 651; Amodeo v. Francis, 681 A.2d 462, 465 (Me. 1996).

In this case the Welch plaintiffs have offered sufficient evidence for summary judgment purposes on the first and third elements listed above. The remaining question is whether there is a lack of access "for all practical purposes" to the conveyed lot. In the absence of "strict necessity," the law will not imply an easement. Frederick, 573 A.2d at 389. The Law Court has also noted that access by water to the landlocked parcel often defeats a claim of easement by necessity. "Land abutting navigable water is generally not entitled to an easement by necessity over neighboring land." Murch, 2004 ME 139 ¶ 20, 861 A.2d at 652.

On the issue of access, the State has offered evidence that the Welch parcel has access by boat from various points on Rangeley Lake, including public boat launches at Rangeley, at Oquossoc, and in the State Park itself. State's SMF dated February 14, 2005 ¶ 36 (admitted[7]). The State has also offered evidence that two of the Welch plaintiffs

---

[7] Although the Welch plaintiffs admitted paragraph 36 of the State's February 14, 2005 SMF, they qualify their admission by asserting (without any citations) that this does not constitute access for all practical

have an interest in a private boat landing on the west side of South Bog Cove which is less than a mile from the property for which they now seek an easement. State's SMF dated February 14, 2005 ¶ 5 (admitted). All three of the Welch plaintiffs have in fact accessed the Welch property by water. State's SMF dated February 14, 2005 ¶ 36.

The State has also offered evidence that in addition to the property that is the subject of this lawsuit and for which an easement is sought, plaintiffs Robert and Janet Welch also have an ownership interest in several islands in Rangeley Lake known as the South Bog Islands. The largest of these islands is Narramantic Island, located in Rangeley Lake at the entrance of South Bog Cove about one half mile northwest of the Welch property that is the subject of this lawsuit. State's SMF dated February 14, 2005 ¶ 3 (admitted). When a fire destroyed camps on Narramantic Island in 1988, Robert Welch rebuilt those camps with materials brought by boat to the island. Id. ¶4 (admitted).

Finally, the State has offered evidence that during winter the Welch parcel can be accessed by snowmobile, cross-country skis, or snowshoes. Id. ¶ 37 (admitted[8]). Robert and Janet Welch use their snowmobile to cross the ice from Narramantic Landing to their camps on Narramantic Island. Plaintiffs' March 10, 2005 Opposition to Defendant's SMF ¶ 46. Thousands of snowmobiles cross the trail on Rangeley Lake between Oquossoc and Rangeley every season. State's SMF dated February 14, 2005 ¶ 43 (admitted).

On the other hand, the Welch plaintiffs have offered evidence that small boat travel on Rangeley Lake can occasionally be hazardous on windy days. Plaintiffs' SMF

purposes for year round use of the Welch property. See Plaintiffs' March 10, 2005 opposition to Defendant's SMF ¶ 36.
[8] The Welch plaintiffs admitted this paragraph although they again qualified their admission by asserting (without citations) that this does not constitute access for all practical purposes for year round use. Plaintiffs' March 10, 2005 Opposition to Defendant's SMF ¶ 37.

dated January 21, 2005 ¶ 14. Plaintiffs have also offered evidence that during the period when ice is forming in late fall and melting in the spring, there are periods when the lake is not passable either by water or over the ice. Id. ¶ 15.[9] Plaintiffs have finally offered evidence that even when the lake is frozen, passage over the ice by snowmobile may be difficult or dangerous because of the formation of pressure ridges, areas of thin ice where water is moving at the mouth of tributaries, and snow drifts. Plaintiffs' January 21, 2005 SMF ¶¶ 22-24.

The above facts demonstrate that there is a disputed issue for trial as to whether there is currently a lack of access to the Welch property for all practical purposes. However, a review of the governing case law demonstrates that whether an implied easement exists is to be determined "by examining the circumstances existing at the time the landlocked parcel is severed from the parcel with access." Morrell v. Rice, 622 A.2d 1156, 1160 (Me. 1993) (emphasis added). See Frederick v. Consolidated Waste Management Services, 573 A.2d at 389:

> In the absence of strict necessity for an easement over the CWS parcel at the time of the severance of unity of title, the law will not imply one.

(emphasis added). Thus, in Shadan v. Town of Skowhegan, 1997 ME 187 ¶ 9, 700 A.2d 245, 248, the Law Court affirmed a finding that an easement by necessity did not exist, noting that there was no evidence in that case that "at the time Shadan alleges his parcel and adjacent parcels were severed by a common owner," the use of the retained parcel was strictly necessary to the enjoyment of the conveyed land.

In this case, accepting the Welch plaintiffs' evidence as to the existence of a road in the late nineteenth century that provided access to the eastern end of the 30-rod strip,

---

[9] It is apparently undisputed that the total time for both fall freeze up and spring melt on Rangeley Lake is generally 4 to 6 weeks. In some years it may be as short as 2 weeks or as long as 8 weeks. State's February 14, 2005 SMF ¶ 40 (admitted).

the Welch parcel was severed in 1902 from the portion of the 30-rod strip that had road access. Plaintiffs' SMF dated January 21, 2005 ¶ 12.[10] Whether an implied easement should be found, therefore, depends on the circumstances existing in 1902.

The summary judgment record before the court demonstrates that, as of 1902, it was not necessary to imply an easement over the retained land in order to provide access to the property which is now the Welch parcel for all practical purposes. On this issue, the State has offered undisputed evidence that in the late 19th century travel to the shores of Rangeley Lake was generally by small boats and by steamboat, that steamboats and "Rangeley Boats" were in widespread use on Rangeley Lake, and that three steamboats were operating on the lake into the early 20th century. State's SMF dated February 14, 2005 ¶¶26, 28 (admitted). Travelers to the area would arrive by rail to within carriage or buckboard travel distance of the lakes and then travel by carriage or buckboard to steamboat landings on various lakes. Id. ¶¶ 23-24 (admitted).

All the evidence in the record shows that as of the beginning of the 20th century, properties such as the Welch parcel were accessed from the water. In a memoir written in 1946, the granddaughter of Frederick Dickson describes living at a camp on the shore of Rangeley Lake, adjacent to what is now the Welch parcel, in the early 1900's. She described the camp as extremely lonely, with "miles and miles of forest" behind it, "intersected by overgrown logging trails which had not been used for a generation." Her link to civilization was by the public steamboat which traveled around the lake and which met the train that went through South Rangeley once a day. State's SMF dated February 14, 2005 ¶ 34 (admitted).

---

[10] That conveyance is in the record as the last page of Exhibit E to the Fowler Affidavit, which refers to certain monuments shown on a plan of the 30-rod strip that is annexed as Exhibit D to the Fowler Affidavit.

It is also undisputed that in the late 19th century travel in remote areas such as the Rangeley Lake region was easier in winter than in summer. Travel over the ice was by foot or by horse and sled. Loggers used "winter roads" to haul logs out of the woods, packing down the snow and icing it to make a smooth path for logs. In the spring, once the lakes thawed, the logs were driven or towed in booms by steamers along the lakes to mills. State's SMF dated February 14, 2005 ¶ 29 (admitted). One notable residence was built by the Dicksons on Ram Island in the middle of Rangeley Lake in 1886. This was a three-story home complete with grand piano and was able to be constructed because the 36 inches of ice covering the lake in winter provided, in the words of one historian, "a hard and smooth road to and from the building site." State's SMF dated February 14, 2005 ¶ 31 (admitted).

In admitting all these facts, the Welch plaintiffs suggest that circumstances in the late 1800's and early 1900's are irrelevant to the question of modes of travel in the 21st century or means of access to the Welch parcel in modern times. See, e.g., Plaintiffs' March 10, 2005 Opposition to State's SMF ¶¶ 23-24, 26, 28, 31, 34. The relevant case law discussed above, however, demonstrates that the issue of necessity is to be considered based on the circumstances existing at the time the property was severed. At that time there were no automobiles or trucks and no electric utility lines. At that time, there was no need for driveways or utility easements. All of the evidence before the court demonstrates that access by water or over the ice, while at times inconvenient, was available for all practical purposes to the Welch parcel in 1902. The Welch plaintiffs have offered no evidence to controvert the State's showing on this issue, and the State is therefore entitled to summary judgment dismissing the Welch plaintiffs' easement by necessity claim.

The entry shall be:

Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Accordingly, judgment shall be entered dismissing the complaint. In view of this result, the court does not need to decide defendant's motion to amend. Defendant's motion to strike is denied. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January _19_, 2006

Thomas D. Warren
Justice, Superior Court

PI.

ANDREW SPARKS, ESQ.
1 MONUMENT WAY
PORTLAND, ME 04101

---

Def. ME

LUCINDA WHITE, AAG
6 STATE HOUSE STATION
AUGUSTA, ME 04333-0006